385 So.2d 599 (1980)
Iola NATHANIEL
v.
CITY OF MOSS POINT, Mississippi.
No. 51710.
Supreme Court of Mississippi.
April 9, 1980.
Rehearing Denied July 23, 1980.
Watts & Bilbo, Pat H. Watts, Jr., Pascagoula, for appellant.
Megehee, Brown, Williams & Mestayer, Raymond L. Brown, Pascagoula, for appellee.
En Banc.
WALKER, Justice, for the Court.
This is an appeal from the Circuit Court of Jackson County, Mississippi, which, after both sides had put on their proof and rested, granted a peremptory instruction exonerating the City of Moss Point of any liability for damages sustained by Iola Nathaniel arising out of an automobile collision between *600 the plaintiff, Iola Nathaniel, and one Barfield, who was not a party to the suit.
It was contended by Mrs. Nathaniel that the City was negligent in failing to reerect a stop sign which was down after having reasonable notice that it was down.
On the morning of the accident, March 12, 1976, between 6:00 and 6:20 in the morning, Mrs. Nathaniel was traveling east on Meadow Drive in the City of Moss Point on her way to work. The automobile which she struck was traveling north on Juniper and was driven by one Margaret Barfield. Mrs. Nathaniel testified on direct examination with reference to the accident as follows:
Q. All right, now what I want you to do is to tell the Jury what happened; about what time it was; and where it happened and where you were going?
A. I was headed east on Meadow Drive. I was on my way to work. It happened between 6:00 and 6:20 a.m. in the morning.
Q. All right now, where do you live in reference to that intersection?
A. Well, I live west of Meadow Drive.
Q. But you were going east on Meadow Drive at this time?
A. Yes.
Q. Where did the accident actually occur?
A. At the intersection of Juniper and Meadow Drive.
Q. What type of road is this? Is it a two-lane or a four-lane road?
A. Two lane.
.....
Q. Now, if you recall, what type of weather was it on that day?
A. It was fair weather. Early in the morning. You really don't know how it is that early; it wasn't raining, though, or nothing.
Q. I want you to tell the Court and the Jury exactly how this happened in reference to how you were going and what you did, and how the other car was going and what that car did?
A. Well on March the 12th  it was on a Friday morning. I was on my way to work. I had picked up two of my riders and I was on my way to pick up another lady to take to work. And I got right at the intersection and I seen this car and I said, "On my god, she ain't even going to stop." And I slammed on brakes. And when I slammed on brakes, I collided with her right in her side.
.....
A. Well I had only been going that way for about three weeks, that little street, because the other lady that was in the car with me was dropping her baby off on Eastwood.
Q. Right.
A. And that made me turn on Meadow Drive and be going that way. And for the last three weeks, there wasn't no stop sign there because I would always get in there and kinda slow up and pull on across the road.

Q. Now you say you never had been on that street before this period of time?
A. Yeh, I had been on that street.
Q. Before that three week period?
A. Yeh. But there wasn't no stop sign up.
Q. Are you saying there never was a stop sign up there?
A. I had never seen one up.

Q. Now, on this occasion you said you were driving about thirty miles an hour?
A. Uh huh.
Q. Did you slow down to thirty before you got to this intersection, or did you just come through it at thirty? What did you do?
A. I slowed down. I wasn't driving no more than thirty-five, but I slowed down approximately to thirty miles. I hadn't seen anything all the other mornings and I had assumed I had the right of way all the time.

Q. Okay, now you looked both ways before you entered it?
A. Yes.
(Emphasis added).
*601 The evidence showed that the automobile driven by Mrs. Nathaniel struck the four-door automobile driven by Margaret Barfield between the "middle and back-end of the car."
For the purpose of this opinion, we will assume, arguendo that there was an ordinance of the City of Moss Point directing that a stop sign be placed at the southwest corner of the intersection of Meadow Drive and Juniper; that the sign was down, although through no fault of the City, and that the City had reasonable notice that it was down.
It is well settled that the decision by a municipality whether to place traffic control devices at an intersection is a governmental function and that a municipality cannot be held liable for failure to place traffic control devices at an intersection. Wall v. City of Gulfport, 252 So.2d 891, 893 (Miss. 1971).
It is also well settled that, absent statutory provisions, there can be no recovery against a municipality based on negligence in the exercise of functions which are essentially governmental in character; however, when acting in a private or proprietary[1] capacity, it is liable in tort the same as private corporations. Tucker v. City of Okolona, 227 So.2d 475, 476 (Miss. 1969).
This Court has held that the maintenance of "bumpers" in streets, City of Vicksburg v. Harralson, 136 Miss. 872, 101 So. 713, 39 A.L.R. 777 (1924); White v. Thomason, 310 So.2d 914 (Miss. 1975); overhead traffic control lights, Tucker, supra; and stop signs, Wall v. City of Gulfport, supra, are proprietary functions.
In Wall v. City of Gulfport, supra, it was said:
Our research reveals there are cases from other states which hold that where there is a city ordinance requiring the city to maintain stop signs at an intersection, the maintenance of such stop signs is a proprietary function and the city may be held liable for the failure to replace a stop sign at such intersection. Buckley v. City of Chicago, 3 Ill. App.2d 39, 120 N.E.2d 375 (1954); Grantham v. City of Topeka, 196 Kan. 393, 411 P.2d 634 (1966). The record in the case before us is silent as to whether there was any ordinance requiring the city to maintain stop signs at this intersection. We hold that in the absence of an ordinance requiring the city to maintain traffic control devices at an intersection, the decision of whether to replace a traffic control device at an intersection which has been completely removed is a governmental function and not a proprietary one. (Emphasis added).
It is not necessary for us to decide whether the failure of the City of Moss Point to replace the stop sign in question, after it was torn down by vandals, was proprietary rather than governmental because we have concluded that there was no causal relationship between the stop sign being down and the injuries and damages incurred by Mrs. Nathaniel. In Wall v. City of Gulfport, supra, this Court, speaking through the late Justice Inzer, said:
The question involved in the Tucker case was whether the maintenance by the city of an overhead traffic control light at a street intersection for the control of vehicular traffic was a governmental function or a proprietary function. We held the trial court was in error in sustaining a demurrer to the declaration which charged that the plaintiff was driving in a careful and prudent manner in reliance upon the green light and entered the intersection on the green light. The traffic light was out of repair, a fact known to the city for a period of at least a week. The light suddenly and immediately *602 changed from green to red, thus giving a green light to an oncoming vehicle resulting in a collision which damaged plaintiff's automobile. We held the maintenance of the traffic light was a proprietary function. However, there is a marked distinction between maintaining an overhead traffic light and the replacement of one that has been completely removed. The action of the city in having a defective light which showed green to both oncoming vehicles could render the street unsafe for persons using ordinary care for their own safety. However, the absence of any traffic control device at an intersection does not render the intersection unsafe for use by persons exercising ordinary care and caution for their own safety. (Emphasis added).
.....
We are also of the opinion the trial court was correct in holding the facts in this case did not present a jury issue as to the liability of the city. The proof is uncontradicted that the intersection in question was reasonably safe for use by persons exercising ordinary care and caution for their own safety. We are of the opinion this case falls within that category of cases wherein we have uniformly held the city is entitled to a peremptory instruction. The defective condition here was not created by the city, it was relatively insignificant or trivial, and it was easily discernible by persons using ordinary care and caution for their own safety. In fact, this intersection was no more dangerous or unsafe than any other intersection where there are no traffic control devices.
In the case now before us, the intersection at Meadow Drive and Juniper was reasonably safe for use by persons exercising ordinary care and caution for their own safety. As in Wall, supra, the defective condition was not created by the City, it was relatively insignificant or trivial, and it was easily discernible by persons using ordinary care and caution for their own safety. The absence of any traffic control device at an intersection does not render the intersection unsafe for use by persons exercising ordinary care and caution for their own safety, and this particular intersection was no more dangerous or unsafe than any other intersection where there are no traffic control devices.
There is a marked distinction between a sign, which, in some manner, misleads a motorist into proceeding into an intersection into the path of traffic, as in the case of a traffic control light with "green" on both sides, and a situation where the sign is simply no longer in place.
In the latter instance, where there is no sign to direct them, the motorists must abide by the rules of the road and they may not complain of the absence of a traffic control device.
Mrs. Nathaniel drove into this intersection at a speed of thirty miles per hour "assuming," as she put it, that she had the right-of-way. It is manifest from her testimony that Mrs. Nathaniel's injuries and damages were the result of her failure to use reasonable care and caution for her own safety when entering the intersection, and the trial court properly granted the defendant, City of Moss Point, a peremptory instruction in its favor.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
SMITH and ROBERTSON, P. JJ. and SUGG and LEE, JJ., concur.
PATTERSON, C.J., and BROOM, BOWLING and COFER, JJ., dissent.
BROOM, Justice, dissenting:
I must with deference dissent because upon the pleadings and evidence there was made out a clear-cut jury issue which should have been left to the jury for its determination.
As stated by the majority opinion, Mrs. Nathaniel was traveling East on Meadow Drive when her vehicle was involved in a collision with another driven by one Barfield headed North on Juniper. The vehicles *603 collided in the intersection of Meadow Drive and Juniper, which intersect each other at approximate right angles. Set forth in the majority opinion correctly is a substantial portion of Mrs. Nathaniel's testimony but omitted is the salient and critical part of her testimony which the majority apparently completely eliminates from consideration. Omitted from her testimony is the following:
Q. What type of surroundings in reference to  is it a subdivision, or what is it?
A. Yes, it is a subdivision. There is [sic] houses on all four corners of the streets.
.....
Q. All right. In these intersections here you indicated that there were houses. Were they at each corner?
A. Yes.
As appears in the abstract of testimony and as is demonstrated by photographs in the record, proceeding East on Meadow Drive, Nathaniel's vision to the South on Juniper on which Barfield was headed North, would obviously be obscured by houses. Mortal beings cannot see through houses, and it appears only logical to deduce from the evidence that plaintiff Nathaniel could not see traffic headed North on Juniper until she was practically within the intersection. Further, on cross examination, Nathaniel was asked:
Q. Okay, now you looked both ways before you entered it?
A. Yes.
("It" in the above quoted portion refers to the intersection where the accident occurred). Although the above is quoted in the majority opinion, it is obviously ignored. The majority opinion states:
It is manifest from her testimony that Mrs. Nathaniel's injuries and damages were the result of her failure to use reasonable care and caution for her own safety when entering the intersection, and the trial court properly granted the defendant, City of Moss Point, a peremptory instruction in its favor.
Our well-established rule is that when considering a requested peremptory instruction, the judge should consider all of the testimony and reasonable inferences in the light most favorable to the party litigant (Nathaniel) against whom such instruction is requested. Application of the rule here results in at least a reasonable and rational basis upon which one considering the testimony could conclude that Nathaniel's attempt to look to her right (down Juniper upon which the other car was approaching in a northerly direction) would be obscured by the houses at the intersection until she was practically within it. From her testimony, it is logical to conclude that she was practically within the intersection before the other car was visible to her, at which time, seeing the other car was not going to stop, Nathaniel "slammed on brakes" in an effort to avoid the collision.
Giving consideration to Nathaniel's testimony and reasonable inferences which may be drawn from it in her favor, I simply cannot agree that "it is manifest from her testimony" (language of the majority) that she was injured and damaged because of her own failure to use reasonable care and caution for her own safety. Noteworthy is the fact that the trial court did not find that her negligence caused her damages, and the peremptory instruction rested solely on sovereign immunity.
The majority opinion has completely and totally overlooked Mississippi Code Annotated § 11-7-17 (1972), which provides that:
All questions of negligence and contributory negligence shall be for the jury to determine.
Annotations under the quoted code section are legion to the effect that this case should have been submitted to the jury for it to resolve each and every question as to whether Nathaniel's negligence or the negligence of Moss Point by failing to keep the stop sign properly in place caused the unfortunate accident in which she was injured and damaged. Here there was clear evidence to the effect that Moss Point had been advised that the sign was down and not in proper place. Bates v. Walker and *604 The Merchants Co., 232 Miss. 804, 100 So.2d 611 (1958) is a case wherein the plaintiff entered an intersection without stopping even though confronted with a flashing red signal light. Our opinion there states the
[C]ourt instructed the jury at the request of the appellees that appellant's failure to stop before entering the intersection was a violation of the applicable law and was, therefore, negligence, but the court submitted for the determination of the jury the issue as to whether such negligence was the sole cause of the collision, and the jury resolved this issue in favor of the appellees. Such instruction was proper... .
There the case was resolved by the jury against the plaintiff. Here Nathaniel's case should be decided by the jury which might find against her but the point is: reasonable minds can disagree here on whether there was causal relationship between (1) the stop sign being down and (2) the collision. The majority, in effect, is saying to Nathaniel  you are so calloused and such a negligent motorist that you would not have heeded a stop sign had it been there. Somehow it appears that someone has read her mind or otherwise divined her psychic.
The majority went to some length in discussing whether Moss Point was under a duty to keep the stop sign in place. A number of cases are cited including Wall v. City of Gulfport, 252 So.2d 891, 893 (Miss. 1971) which the majority interprets to mean that whether to place a traffic control device at an intersection is a governmental function for which a municipality cannot be held liable. In the instant case there is no issue in this regard because Moss Point admitted that it was under a duty both to erect and maintain (emphasis added) a stop sign in the southwest corner of the intersection of Juniper Street and Meadow Drive. Wall v. City of Gulfport, supra, relied upon by the majority, is not controlling here where the city admitted its two-fold responsibility and duty to erect and maintain the traffic sign, and for the further reason that in the present case it was not "uncontradicted" that by using ordinary care and caution Mrs. Nathaniel would not have been injured.
On the facts of this case where Moss Point admitted it was under the two-fold duty to "erect" and "maintain" the stop sign, I cannot accept the language of the majority that plaintiff Nathaniel "may not complain of the absence" of the sign. If that be a correct statement of the law, then the word "duty" no longer connotes "responsibility" or "obligation" and defies the very definition of "duty". Webster's Third New International Dictionary, 1971 ed.
Because Moss Point admitted and left no issue as to its duty to maintain the stop sign, I feel strongly that § 11-7-17, supra, and the decisions of this Court in all fairness should be applied so as to let Mrs. Nathaniel have her full day in court and have the questions of negligence and contributory negligence decided by a lawfully constituted jury in accordance with the statute. At trial the case was decided (by peremptory instruction) on governmental or sovereign immunity, but here the majority reached its decision on a totally different theory: Nathaniel's "failure to use reasonable care... ." It may very well be that had Moss Point discharged its admitted duty to maintain the stop sign  possibly the collision would have occurred anyway. The uncontradicted truth is: the stop sign might have made a difference, and only the jury should decide the issue. Nevertheless, this appellate Court has assumed the role of jurors and summarily found for Moss Point in a case where reasonable minds can logically differ on whether a stop sign in proper position would have caused Nathaniel to act differently than as she acted here where the sign was down. Clearly testimony in the record when construed in her favor as we must do in this posture of the case, negated any holding that she (and she alone) caused her own injuries and damages by her failure to use reasonable care and caution.
PATTERSON, C.J., and BOWLING and COFER, JJ., join this dissent.
NOTES
[1] In the maintenance and repair of streets, municipalities act in a proprietary or corporate capacity and may be held liable for the negligent performance of this function. Warren v. Town of Booneville, 151 Miss. 457, 118 So. 290 (1928). Abstract formulae for determining the character of municipal functions have been stated in former decisions, City of Pass Christian v. Fernandez, 100 Miss. 76, 56 So. 329, 39 L.R.A., N.S., 649 (1911)... . (Tucker v. City of Okolona, 227 So.2d at 476).